THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RAYMOND L. FOUNTAIN, Defendant-Appellant.

First District (5th Division) No. 87—1668

Opinion filed February 17, 1989.—Rehearing denied March 13, 1989.

Thomas P. Cernek and Jeffrey T. Cernek, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Carol L. Gaines, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Following a bench trial, defendant Raymond Fountain was found guilty of aggravated battery and home invasion (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(a), 12—11(a)(1)). He was sentenced to four years' imprisonment for aggravated battery and seven years for home invasion, the sentences to run concurrently. On appeal, defendant contends: (1) he was denied due process of law as a result of ineffective assistance of counsel; (2) the court erred in admitting two of plaintiff's exhibits and considered evidence "not in the record"; (3) the trial court impermissibly allowed amendment of the home invasion count of the indictment prior to trial; (4) he was not proved guilty beyond a reasonable doubt; and (5) the court improperly admitted a victim impact statement at his sentencing hearing. For the reasons set forth below, we affirm.

At trial, complainant Steven Halas stated that on May 21, 1986, at approximately 11 p.m., he was walking in the parking lot of the apartment complex where he lived in Des Plaines, Illinois; his doctor had recommended this exercise as therapy because he had injured his leg five years earlier, it had been amputated below the knee, and he wore a prosthesis. At that time, he heard music and people "hollering" back and forth. He also heard rocks bouncing off the cars in the parking lot and determined they were being thrown by people from the viaduct area nearby. He then shouted to whoever was throwing the rocks to stop. Receiving no response, he climbed a 25-foot hill to the area above the viaduct and saw several people drinking beer; he was unable to determine how many people were present because it was dark. He then approached defendant and told him to leave or else he would call the police. Defendant stated he and his group were not going to leave. Halas repeated that he was going to call the police and, upon turning to leave, defendant grabbed him by his left shoulder; in response, he grabbed defendant's arm to defend himself, and defendant struck him over the left eye with a beer bottle, which broke

in the process. Although Halas was bleeding profusely, he wrestled defendant to the ground because defendant would not let him go, he was able to hold defendant down, and he told defendant he was going to call the police and was taking defendant's wallet so he could identify him. Halas then got off defendant, walked to his apartment, and called the police.

Halas further testified that while he was talking to the police, he heard the sound of breaking glass at the back of the apartment building, scuffling in the hallway, and someone kicking at his back door. He related this disturbance to the police and they told him to stay on the line. He then saw the frame of his door break and defendant came running into the apartment screaming in a high-pitched voice. Halas told defendant to "be cool" in an attempt to calm him. Defendant proceeded to tackle Halas and they both fell to the ground, pulling the telephone out of the wall in the process. Halas was able to get defendant under him and "kneel on him." After telling defendant he was going to keep him there until the police arrived, defendant yelled to his friends for help. Two male friends of defendant's entered the apartment, and one of them, William Petrucci, caught Halas from behind, held a wooden two-by-four over his head, and said, "If you don't get off of him, I will have to hit you." Halas then let defendant go and, upon leaving the apartment, one of his friends picked up his wallet.

Thereafter, Halas observed that his apartment was "demolished"; blood was everywhere, his apartment door and kitchen telephone were broken, his kitchen stove was damaged and chairs were knocked over, and other items in the living room were knocked over. In the hallway he saw a rock and broken glass and, next to the rear entrance, a window, screen and the frame of the door had been broken.

Halas talked to the police upon their arrival and was then taken to a hospital where he received 56 stitches; his face had been lacerated above his left eye, reaching the muscle, resulting in his inability to raise his eyebrow, and his left and right cheekbones were also lacerated. While at the hospital, Halas talked to police lieutenant Ronald Russell and identified Petrucci from a set of photographs as the person who threatened him with the two-by-four. At a subsequent meeting with Russell at his office, Halas identified defendant as his assailant from a second set of photographs.

Pamela Holby, called as a witness for the prosecution, testified that she lived in the garden apartment across from Halas. She was watching television on May 21, 1986, at approximately 11 to 11:30 p.m., when she heard a loud crash which sounded like breaking glass at the rear of her apartment. She then heard someone ringing her

doorbell, banging on her door, and turning the doorknob. When she opened the window curtains, she saw two men—defendant and another individual—standing at her door. One man held a two-by-four in his hand. As she looked in the hallway, she also saw broken glass and a rock on the floor. Defendant told Holby he had to get his (expletive) back. Immediately thereafter both men left when the person holding the two-by-four told defendant that they had the wrong apartment. Holby then went to her kitchen to telephone the police and heard a loud bang and wood cracking, which sounded like it was coming from Halas' apartment. She also heard screaming, someone running, and then "someone" saying, "I don't want to have to do this but I will waste you with this two-by-four if you don't let him go." She then heard Halas respond, "Fine, I will let him go." Thereafter, she heard someone come out of Halas' apartment into the hallway and, after she heard the door shut, she saw "legs run past her kitchen window."

When Holby went to her rear door, she heard Halas open his door and observed blood on his doorbell, the stairs, and on the walls. She also saw Halas standing in the hallway with a shirt pressed over his eye and blood on his hand, arm and face and, when he removed the shirt from his eye, she saw that the top of his eyebrow was hanging over his eye and bleeding. Holby further testified that when the police arrived they asked her to identify one of the suspects but she did not do so, even though she recognized Petrucci as the person holding the two-by-four, because she was afraid. Some days later at the police station, however, she identified Petrucci, as the person holding the two-by-four, and defendant from the two sets of photographs previously shown to Halas.

Defendant testified on his own behalf. Contrary to Halas' version of the events on May 21, 1986, he stated that initially he was celebrating his graduation from high school with some friends at the railroad tracks over the viaduct, drank four to six beers, slipped and fell six feet from a concrete ledge, and hurt his ankle. He did not ask his friends to take him to a hospital, although he was in great pain and felt like throwing up, but instead, climbed onto another slab of concrete because it was cold and therefore comfortable in his injured condition. One of his friends then placed a radio next to his head, turning the volume up, and he closed his eyes because of the pain in his ankle. While in this position, Halas suddenly came upon him and proceeded to yell at him, accusing him of throwing rocks at the cars in the parking lot. Defendant said he was alone at that time; his friends had apparently left the area. Defendant further stated that Halas grabbed him, yanking him to his feet, and hit him on the side of his head with

a closed fist; he kept slapping him every time he tried to speak; when Halas pushed him to the ground, he grabbed a bottle and broke it on the concrete in the hope that in doing so he would make Halas leave him alone; that instead of leaving, Halas "came right for" him and grabbed him around the neck; Halas then wrestled him to the ground and proceeded to strangle him and bang his head into the concrete; he subsequently struck Halas across his face with the beer bottle; and Halas finally left him alone after taking his wallet.

Defendant further testified that he followed Halas but could not really see because he had blood in his eyes and he remembered telling one of his friends, who apparently had returned, that Halas took his wallet. Upon arriving at the apartment complex, defendant stated that he kicked out the window to the building which he had seen Halas enter, and he "yelled for his wallet." (Defendant also later stated that he had keys to the security door of the building, because his girl friend lived in the same building, and he used the keys to enter the building.) He then proceeded to pound on all the doors in the hallway until his friend pointed him to Halas' door; he banged on Halas' door and told him to come out with his wallet or he would come in; when Halas did not come out, he put his shoulder to the door, the door opened, and he saw Halas talking on the telephone and "went after him"; he wrestled Halas to the floor and, in doing so, the telephone came away from the wall; his friend, Petrucci, came into the apartment and was able to get Halas "off of him"; another friend came into the apartment and took his wallet upon their leaving the apartment; and he then ran to his van and went to his girl friend's father's home, but he did not call the police while there.

Kristal Cummings, defendant's girl friend, testified that defendant had been her boyfriend for 2½ years; she lived in the same apartment complex as Halas; she and other friends went to the viaduct area on May 21, 1986, to drink beer in celebration of defendant's high school graduation; she did not stay with defendant the entire evening; at one point defendant fell off a concrete slab and hurt his ankle; she was sitting next to defendant when she heard a man coming up the hill and the man stated he was going to call the cops or that he was a cop; she and the other people, except for defendant, "ran" because they were under the legal drinking age; 10 to 15 minutes later she saw defendant in his van lying on the floor, delirious and full of blood—"he was cut on his side"; when she saw the police coming, she did not go to them but instead drove defendant's van to her father's house; her father drove defendant home; and neither she nor defendant's friends "looked for, went to or called the police that night."

Following the close of all the evidence, the trial court found defendant guilty of aggravated battery and home invasion, having expressly rejected defendant's defense of self-defense (*i.e.*, that Halas was the aggressor and he acted in self-defense). A post-trial motion filed by defendant was denied. At defendant's subsequent sentencing hearing, defendant informed the court that he had not received the victim's impact statement (VIS) and he therefore objected to the State reading the statement into the record, arguing that he had just received it and the statement contained inflammatory material and inconsistencies and would require an investigation to verify the allegations. The court overruled defendant's objection, stating that the sentencing hearing was not a trial and that the VIS was not evidence. The court further stated that the VIS was not given under oath and therefore defendant had no right to cross-examine Halas on the content of the statement. Thereafter, the court, after considering the presentence report, the VIS and all arguments in aggravation and mitigation, sentenced defendant as set forth above, and this appeal followed.

Defendant's first argument on appeal is that he was denied due process of law as a result of ineffective assistance of counsel. Specifically, he contends that his counsel's representation of him amounted to no representation based on the fact that his counsel stipulated to admission of the State's exhibits 2 through 8 (photographs), allowed the State's exhibit 1 (a tape recording of plaintiff's conversation with the police) "to be admitted over objection," allowed the indictment to be amended without objection, failed to call additional witnesses on behalf of the defense, and failed to develop a theory of defense.

■ To establish ineffective assistance of counsel, a defendant must show that counsel's presentation of his case was so constitutionally deficient that it produced substantial prejudice to defendant without which the result of the proceedings would have been different. (*People v. Williams* (1986), 140 Ill. App. 3d 216, 228, 488 N.E.2d 649.) Both counsel's incompetence and the resultant prejudice must be clearly established by defendant. (*People v. Rodriquez* (1983), 117 Ill. App. 3d 761, 454 N.E.2d 13.) A defendant must further overcome a strong presumption that counsel's conduct might be considered sound trial strategy. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270.

■ In the instant case, we find defendant's ineffective assistance of counsel argument without merit. We first observe that the admission of a photograph into evidence is within the sound discretion of

the trial court (*People v. Rolan* (1979), 71 Ill. App. 3d 746, 390 N.E.2d 107) and all that is required for its admission is the testimony of a witness who has personal knowledge of the object, person, or scene depicted in the photograph and attests that the photograph is a fair and accurate representation of the object, person, or scene depicted at the time it was taken (*People v. Pope* (1985), 138 Ill. App. 3d 726, 486 N.E.2d 350).

Here, defendant contends that defense counsel should have objected to admission of seven photographs of Petrucci and other unidentified individuals because the connection of the unidentified individuals with the proceeding was never established and Petrucci was not tried with defendant; admission of six photographs of defendant because defendant voluntarily surrendered himself to the police and there was no issue concerning his identity; admission of 12 photographs of the scene of the incident; admission of a photograph of a rock and a two-by-four; and admission of photographs of Halas taken on the night of the incident.

■ We find defendant's contentions mere assertions; he simply fails to articulate how he was prejudiced by admission of the photographs. Moreover, in light of the testimony of Halas and Holby, on-the-scene witnesses, the photographs, which they testified were true and accurate depictions, amounted to cumulative evidence, *i.e.*, a pictorial representation of their testimony. Accordingly, any objection by defense counsel would have been a futile act.

■ Similarly, we reject defendant's argument that defense counsel's failure to "prevent" admission of the tape recording between Halas and the police into evidence amounted to ineffective assistance of counsel. It is well settled that sound recordings, which are otherwise competent, material and relevant, are admissible if a proper foundation has been established to assure the authenticity and reliability of the recording. (*People v. Melchor* (1985), 136 Ill. App. 3d 708, 483 N.E.2d 971.) A sufficient foundation is made when a party to the taped conversation testifies to its accuracy and the defendant makes no claim of any changes or deletions in the recording. (*People v. Johnson* (1984), 122 Ill. App. 3d 532, 461 N.E.2d 585.) In the instant case, defense counsel initially objected to admission of the tape, arguing that it contained hearsay and was not probative. The trial court ruled otherwise and stated that defense counsel would have an opportunity to cross-examine Halas concerning the content of the tape and, if the court determined the tape was not an accurate duplicate of the original, it would strike the exhibit completely. The record further discloses that Halas testified to what words and noises would be con-

tained on the tape and stated that he had listened to it 20 minutes earlier and that it was an accurate duplicate of the original. The tape was admitted into evidence, and the trial court allowed the State to play it; defense counsel did not object to the contents of it after it was played.

■ Defendant argues that defense counsel was incompetent because he had not listened to the original tape prior to trial and his "utterance evincing his lack of knowledge concerning [the tape] demonstrates a lack of expertise which redounded to the detriment of defendant's right to a fair trial." It is unclear whether defense counsel in fact had never heard the original tape but, in any event, we note that Halas' testimony as to what words and noises were contained on the tape corresponded with those revealed upon the playing of the tape. Therefore, defendant could not have been prejudiced as a result of defense counsel's alleged failure to have examined the original tape. We also observe that the State laid a proper foundation for admission of the tape and, therefore, any further action by defense counsel would have been futile.

■ Defendant's last argument with respect to the admission of the State's exhibits concerns the stipulated admission of exhibit 8, a two-by-four in a paper wrapping which was never opened. In considering this exhibit, the trial judge stated that as "an old carpenter," he estimated that the two-by-four was 30 to 34 inches in length. Defendant contends that the court's evaluation of this evidence was "outside the record" and denied defendant the right to "challenge the efficacy of the Court's consideration of this piece of evidence." We note that prior to admission of exhibit 8, a photograph of the two-by-four had been admitted into evidence and both Halas and Holby identified it. An estimation of its length, even 10 inches or more off, would not diminish the dangerous nature of its use as a weapon under the circumstances and, therefore, we find defendant's argument without merit. We further observe that defense counsel could reasonably have believed that exhibition of the two-by-four would only have reinforced the dangerous nature of its use as a weapon upon the trier of fact and, as a trial tactic, he sought to avoid this possible impact. Such trial tactics are not a basis for a finding of ineffective assistance of counsel. *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270.

■ ■ Defendant also contends defense counsel failed to provide effective representation because he did not object to amendment of the home invasion count of the indictment to change the weapon used from a "bottle" to a "piece of wood." We find defendant's argument without merit. Although the scope or offenses charged in an indict-

ment may not be broadened by an amendment, except by the grand jury (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508), an amendment of the manner in which the offense was committed may be made by motion of the State's Attorney or a defendant at any time because of *formal defects* (Ill. Rev. Stat. 1985, ch. 38, par. 111—5; *People v. Coleman* (1971), 49 Ill. 2d 565, 276 N.E.2d 721). Here, the State, in requesting amendment of the indictment to substitute "a piece of wood" for "bottle" as the weapon used in the home invasion, explained to the trial court that the grand jury transcript indicated that the weapon used in the home invasion was a piece of wood and, accordingly, the word "bottle" was the product of a miswriting. Defense counsel also indicated he believed the indictment was miswritten. Based on the fact that the weapon used only reflects the manner in which the crime was committed—the formal part of the indictment— and the fact that the grand jury itself indicated the weapon used was a piece of wood, we find that the amendment was permissible. Accordingly, we observe again that any objection by defense counsel would have been a futile act.

Defendant next argues that defense counsel's failure to call more than one witness on his behalf amounted to ineffective assistance of counsel. Specifically, defendant contends that because six to eight other people were present on the night of the incident, defense counsel could have called them to testify on his behalf to corroborate his theory of self-defense.

■■ ■ We first note that which witnesses will be presented is a matter of trial strategy. (*People v. Haywood* (1980), 82 Ill. 2d 540, 413 N.E.2d 410.) Secondly, a defendant must demonstrate how a witness who was not called would have aided him and also whether defense counsel did not try to contact the witness. In the absence of such a showing, a reviewing court cannot assess whether defense counsel's alleged omission was prejudicial. (*People v. Plummer* (1986), 151 Ill. App. 3d 94, 502 N.E.2d 1120.) Here, defendant merely asserts that it is likely that his friends, who were drinking with him on the night of the incident, would have corroborated his theory of defense that Halas was the aggressor and that he acted in self-defense. Without more, we must presume that defense counsel, based on trial strategy, did not call any other witnesses because they would not or could not have corroborated defendant's theory of defense.

Defendant's last ineffective assistance of counsel argument is that defense counsel failed to develop a theory of defense, *i.e.*, that "[t]he record is devoid of any evidence that counsel either formulated or attempted to present a theory of defense." Contrary to defendant's ar-

gument, defense counsel did establish defendant's defense immediately upon cross-examination of the State's first witness, the complainant Halas, as evidenced by the following colloquy between him and the court:

"THE COURT: You are alleging that there is provocation here. Is that the basis of the defense?

[DEFENSE COUNSEL]: Yes."

■ We further observe that once the issue of self-defense is raised, the burden shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681), and whether a defendant acted in self-defense is a question to be decided by the trier of fact (*People v. Walker* (1978), 58 Ill. App. 3d 535, 374 N.E.2d 880). Here, the trial court weighed the evidence presented and expressly rejected defendant's self-defense theory, finding defendant's testimony "totally without belief"; the trier of fact apparently gave more weight to the State's evidence than defendant's. Thus, we observe that it was defendant's testimony and proof that was rejected by the court, not defense counsel's presentation of evidence in eliciting that proof.

■ In light of the foregoing, we hold that defendant has failed to show that his counsel's representation of him was so deficient that it produced substantial prejudice to him without which the outcome of the proceedings would have been different.

■ We similarly reject defendant's argument that he was not proved guilty beyond a reasonable doubt. When presented with a challenge to the sufficiency of evidence, it is not the function of a reviewing court to retry a defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *** Once a defendant has been found guilty of the crime charged, the factfinder's role as *weigher of the evidence* [emphasis added] is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) With respect to defendant's aggravated battery conviction in the instant case, the State was required to prove that defendant intentionally and knowingly acted to cause great bodily harm or permanent disability or disfigurement to Halas. (See Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a).) Defendant's only defense would be self-defense. See *People v. Evans* (1982), 104 Ill. App. 3d 598, 601,

432 N.E.2d 1285.

■■ We find, as did the trial court, that the State sustained its burden of proof; the evidence shows that defendant did intentionally strike Halas across his face with a beer bottle, knowing that his act would cause great bodily harm, disability or disfigurement. In the absence of proof by defendant that he acted in self-defense, as determined by the trial court, we see no reason to disturb the trier of fact's determination. Accordingly, viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact would find the essential elements of aggravated battery beyond a reasonable doubt.

■■ We also reach the same conclusion with respect to defendant's conviction for home invasion. To establish the offense of home invasion, the State must prove that a defendant entered the dwelling of another person without authority, he was not a peace officer acting in the line of duty, he entered knowing one or more persons were present in the dwelling, he used force or threatened the imminent use of force on the person(s) within the dwelling, and he was armed with a dangerous weapon. (See Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(1); *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179.) Here, defendant only disputes that the State failed to prove that he was armed with a dangerous weapon when he entered Halas' apartment without authority. On the other hand, the State contends that proof of this element was satisfied based upon an accountability theory, *i.e.*, he aided and abetted Petrucci in his unauthorized entry into Halas' apartment, who was "armed" with the two-by-four.

■■ ■ We first observe that it is well settled that a person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) In the present case, it is undisputed that defendant entered Halas' apartment without authority; he called for Petrucci's assistance once Halas had him pinned on the floor of the apartment; at the time Petrucci entered the apartment without authority, he knew Petrucci was armed with a dangerous weapon—a two-by-four—because Petrucci had entered the building with him holding the two-by-four, as testified to by Holby; and Petrucci threatened Halas with the two-by-four. Because defendant aided and abetted, participated and specifically intended to promote the commission of the offense, he is legally accountable for Petrucci's action in using a dangerous weapon and threatening force

upon Halas. Defendant therefore was proved guilty of home invasion beyond a reasonable doubt.

Defendant's final argument is that a victim impact statement (VIS) was improperly admitted at his sentencing hearing because portions of the statement improperly influenced the trial court. The statement complained of outlined the physical injuries received by Halas, the expenses incurred by him as a result of the injuries, the effect the crime had on his earning ability, his court expenses and financial losses incurred from the crime, the change in his lifestyle and emotions, and how the various sentences which might be imposed on defendant would affect him and his family. Within the content of the statement, however, defendant objected to a reference concerning the fact that Halas was a cripple (to evoke sympathy), Halas' comparison of the home invasion to a "rape" (as being "highly inflammable"), Halas' comment that a close friend of his killed himself with a gun and he [Halas] now keeps a gun under his pillow, and Halas' remark that his father and brother, both police officers, were adamant that defendant get the maximum sentence for his crimes.

In support of this argument, defendant relies on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, where the Court held that the introduction of a VIS in the sentencing phase of the defendant's capital murder trial, which related the opinions of the victims' family members and characterizations of the crimes, violated the eighth amendment and that the presentation of the information by the State could serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As a result, the Court stated that such statements introduced irrelevant and prejudicial considerations and created an unacceptable risk that the death penalty would be imposed arbitrarily and capriciously.

We first observe that *Booth*, unlike the present case, involved a capital crime. We also note that the court stated that its disapproval of the use of a VIS at the sentencing phase of a capital case did not mean, however, that this type of information would never be relevant in any context. The court further noted that 36 States permit the use of VIS in some contexts, which reflects a legislative judgment that the effect of a crime on victims should have a place in the criminal justice system. Like the Federal courts, Illinois does not allow a VIS in capital sentencing hearings. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a)(6); see also *People v. Holman* (1984), 103 Ill. 2d 133, 469 N.E.2d 119.) However, use of a VIS is statutorily authorized in other criminal actions. (Ill. Rev. Stat. 1985, ch. 38, par. 1406.) Spe-

cifically, section 6 of the Bill of Rights for Victims and Witnesses of Violent Crime Act provides that where a defendant has been convicted of a violent crime, the victim may either testify at the sentencing hearing as to the impact of the crime upon him or submit a written statement outlining such impact which may be presented orally at the hearing. (Ill. Rev. Stat. 1985, ch. 38, par. 1406.) The victim's statement is then considered with all other appropriate facts in determining a defendant's sentence. Based on the foregoing, we therefore hold that because defendant's crimes could not have resulted in the imposition of the death penalty, *Booth* is inapplicable and the VIS was properly considered at defendant's sentencing hearing.

 We also briefly note that defendant's contentions that the trial court was improperly influenced by the specific remarks complained of are without merit; the trial court, unlike members of a jury, is well versed in the appropriateness of evidence to be considered in sentencing a defendant and, in this case, the trial court clearly set forth the mitigating and aggravating factors which it considered in determining defendant's sentences—none of which evince consideration of the remarks complained of by defendant. Finally, we observe that although complainant and his father and brother were adamant about defendant receiving the maximum sentences, the court in fact did not impose the maximum sentences; it imposed a four-year sentence for aggravated battery, which carries a two-year minimum and a five-year maximum, and a seven-year sentence for home invasion, which carries a minimum of six years and a maximum of 30 years. Based on the mitigating and aggravating facts set out by the court, we cannot say that these sentences are excessive or that the trial court was improperly influenced by the VIS.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and PINCHAM, JJ., concur.