FIFTH DIVISION
JANUARY 12, 2007

1-04-2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 21122 |
| | ) | |
| GERARDO MARTINEZ, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Colleen McSweeney-Moore, |
| | ) | Judge Presiding |

JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, Gerardo Martinez, was convicted of one count of reckless homicide (720 ILCS 5/9-3 (West 2000)). On June 11, 2004, the circuit court sentenced defendant to 14 years' imprisonment as a Class 2 felon. On appeal, defendant asserts that (1) his sentence for reckless homicide was nine years longer than the maximum sentence permitted under the law that existed on the date on which he was sentenced; (2) his conviction for reckless homicide should be reversed because the jury instruction and the verdict form inadvertently referred to the crime with which defendant was charged as "aggravated reckless homicide," which is not a crime in the Criminal Code of 1961 (Criminal Code) (see 720 ILCS 5/1-1 et seq. (West 2000)); (3) he was denied a fair trial because the State failed to produce the photographs and measurements of the accident scene upon which the State's traffic crash reconstruction expert relied when he prepared a written report in which he concluded how the accident occurred; (4) he was denied a fair trial because the circuit court permitted the State to show the jury pictures of "Wrong Way" signs that were allegedly on the Damen Avenue exit ramp onto which defendant drove his car in the wrong direction and because the circuit court permitted the State to show the jury five pictures depicting

the victim's injuries; and (5) his 14-year sentence was excessive because, during the hearing on defendant's motion to reconsider sentence, the circuit court incorrectly stated that defendant had a "pending" case involving driving under the influence of alcohol. We affirm.

FACTS

Defendant was charged with three counts of reckless homicide, four counts of driving while under the influence of alcohol, and two counts of felony aggravated driving under the influence of alcohol. The State, however, proceeded to trial on only one charge of reckless homicide (720 ILCS 5/9-3(a)(c)(1) (West 2000)).

Evidence produced at trial established the following facts: On July 20, 2002, defendant went to a bar near the intersection of 40th Street and Western Avenue in Chicago, Illinois. Another bar patron, Jose Cahue, stated that when he arrived at the bar, defendant was already sitting alone and drinking beer. Defendant conversed with Cahue and they each had approximately five beers. After approximately two hours, defendant and Cahue exited the bar and traveled in defendant's car to another bar, which was located somewhere on 18th Street in Chicago, Illinois. The two men stayed at the bar on 18th Street for approximately two hours and each had five additional beers.

After drinking the additional five beers, defendant and Cahue exited the bar on 18th Street. Cahue testified that he felt intoxicated when he left the bar on 18th Street and he asked defendant if he would drive him to his home. Defendant, who apparently felt he owed Cahue a favor since Cahue had paid for many of his drinks throughout the evening, agreed to drive Cahue to his home.

By the time defendant and Cahue left the bar on 18th Street, it was approximately 1 a.m. Defendant intended to drive his car onto the Damen Avenue entrance ramp toward Interstate 55; in fact, defendant drove the wrong way onto the Damen Avenue exit ramp. Evidence at trial confirmed that there was a "Wrong Way" sign on the Damen Avenue exit ramp, which defendant passed as he drove up the exit ramp.

2

When defendant reached the end of the Damen Avenue exit ramp, his car was facing southbound toward the northbound lanes of traffic. Defendant drove his car onto Interstate 55 and drove his car across four lanes of traffic and pulled over to the left shoulder of the northbound lanes. At some point, defendant's car collided with a motorcycle driven by Alexis Melendez. Melendez died as a result of the collision with defendant's car.

A number of witnesses testified at trial regarding the circumstances surround the collision. The witnesses' testimony confirmed that immediately before the collision, Melendez was driving his motorcycle in the far left northbound lane, traveling approximately 80 to 100 miles per hour. Evidence at trial suggested that the collision between defendant's car and Melendez's motorcycle occurred in the far left northbound lane of traffic, near the shoulder of Interstate 55. According to the witnesses and other evidence produced at trial, Melendez's motorcycle "disintegrated" when it collided with defendant's car and debris was scattered across the highway.

Illinois State Trooper Brian Walker arrived at the scene of the accident shortly before 2 a.m. on July 21, 2002. Trooper Walker confirmed that it was a warm, clear, and dry evening and he confirmed that the area where the accident occurred was well lighted. Trooper Walker approached the driver's-side door of defendant's car and observed two males inside the car. The driver, identified as defendant, was slouched forward and the passenger, identified as Cahue, was pinned under the dashboard and passenger's seat. Trooper Walker took their pulses, observed their chest compressions, and confirmed that both men were alive. Trooper Walker attempted to awaken defendant by shaking defendant's seat and shouting at defendant, but his efforts to awaken defendant were unsuccessful. Trooper Walker then used his radio to notify the dispatch operator that the two men were alive but that the two men were unresponsive to his efforts to awaken them.

After speaking with the dispatch operator, Trooper Walker walked approximately 60 feet north of defendant's car to where Melendez's body was lying on the shoulder of the highway.

3

Melendez was not moving and he had sustained extensive injuries as a result of the collision with defendant's car. Trooper Walker examined the body and confirmed that Melendez was not breathing and did not have a pulse. An autopsy of Melendez's body later revealed that he had sustained extensive fractures to his skull, his scapula, both his arms, and both his legs. The autopsy further revealed that Melendez's lower spine was broken in such a way that his thigh no longer was attached to his groin.

After confirming that Melendez was not breathing and did not have a pulse, Trooper Walker returned to defendant's car and again attempted to awaken him. After four or five minutes, defendant finally awoke and, according to Trooper Walker, defendant's eyes were bloodshot and glassy, defendant was mumbling incoherently, and defendant's breath reeked of alcohol.

An ambulance arrived and removed Cahue from the passenger's seat of defendant's car. Throughout the time he had been in defendant's car, Cahue had been either sleeping or unconscious. In fact, Cahue testified that he had no recollection of the events between the time that he and defendant left the bar on 18th Street to the time that he awoke in the hospital with sutures in his head.

Defendant was taken to Mount Sinai Hospital, where he was treated by Dr. William Gossman. Dr. Gossman treated defendant at 3 a.m. and, noting the odor of alcohol on defendant's breath, concluded that defendant's primary diagnosis was "acute alcohol intoxication." At 3:17 a.m., in the presence of Trooper Walker, defendant's blood was drawn for purposes of assessing his blood-alcohol content. A forensic toxicologist analyzed defendant's blood sample and concluded that defendant's blood-alcohol concentration was 0.247 grams per deciliter of ethanol, more than three times the legal limit in Illinois, which is 0.08 grams per deciliter of ethanol. In addition, at 3:37 a.m., defendant provided a urine specimen, the results of which confirmed that his urine contained .282 grams of alcohol.

Illinois State Trooper Peter Dimopoulos, an expert in traffic crash reconstruction, arrived at

4

the scene of the collision at approximately 3:30 a.m. on July 21, 2002, to begin his investigation of the circumstances surrounding the collision. Trooper Dimopoulos's investigation involved examining both defendant's car and what remained of Melendez's motorcycle, as well as taking photographs and various measurements of the scene. After completing his investigation, Trooper Dimopoulos prepared a written report in which he concluded how the accident occurred. Trooper Dimopoulos concluded that defendant's car was traveling southbound at a slow speed in the far left northbound lane of Interstate 55. Melendez's motorcycle was traveling northbound in the same left lane of northbound traffic as defendant's car, but Melendez's motorcycle was traveling at a higher rate of speed than defendant's car. The two vehicles collided at the top of the hill crest. Prior to the collision, defendant attempted to swerve his car to the right to avoid the oncoming motorcycle, but was unable to do so. At the point of impact, Melendez was thrown forward from his motorcycle, causing him to strike his chest on the handlebars of the motorcycle. After his chest struck the handlebars, Melendez was thrown over the front of the motorcycle, striking the windshield and then the roof of defendant's car.

Trooper Dimopoulos's conclusion that defendant's car was not parked on the shoulder of Interstate 55 at the point of impact was based on his analysis of the gouge marks he found in the far left northbound lane of Interstate 55. He concluded that the gouge marks were made by defendant's car and his analysis of the gouge marks confirmed that, rather than being parked, defendant's car was moving forward at the time of the collision with Melendez's motorcycle.

At trial, Trooper Dimopoulos testified on the State's behalf. Trooper Dimopoulos confirmed that he took measurements and photographs of the scene, which he attached to the written report he submitted to an "approval committee." At the time of trial, however, the measurements and photographs were no longer attached to the written report Trooper Dimopoulos had submitted to a State Police "approval committee." Trooper Dimopoulos testified at trial that he did not know why the measurements and photographs were no longer attached to the written

5

report. Because the location of the measurements and photographs was unknown prior to trial, the State never tendered those measurements and photographs to defendant. The State tendered other photographs of defendant's car and Melendez's motorcycle and the State provided defendant with a copy of both Trooper Dimopoulos's report and Trooper Walker's report regarding the circumstances surrounding the collision.

Dr. Gerald E. Cohn, also an expert in traffic crash reconstruction, was called by defendant to testify regarding the circumstances surrounding the collision. Dr. Cohn was unable to review the measurements and photographs taken by Trooper Dimopoulos because, as stated, the location of Trooper Dimopoulos's measurements and photographs was unknown at the time of trial. In preparing his report, Dr. Cohn reviewed Trooper Dimopoulos's traffic reconstruction report; he reviewed Trooper Walker's report; and he reviewed a set of photographs of defendant's car and Melendez's motorcycle, which had been photographed at the State Police's secured bay following the collision.

After reviewing these materials, Dr. Cohn discounted the gouge marks upon which Trooper Dimopoulos had relied because, according to Dr. Cohn, the deep gouge marks could have been caused by debris. Dr. Cohn concluded that defendant's car was stopped near the shoulder of Interstate 55 and was facing the northbound traffic. Dr. Cohn opined that Melendez's motorcycle, which was traveling at a high rate of speed, swerved from the far left northbound lane into the shoulder of Interstate 55, striking defendant's stationary car.

Arturo Quintana, a truck driver who often drove his truck on Interstate 55, testified at trial on defendant's behalf. Quintana testified that during the summer of 2002, he drove his truck the wrong way up the Damen Street exit ramp. Quintana stated that he drove his truck approximately four feet up the exit ramp before realizing he was traveling in the wrong direction, at which point he drove his truck in reverse off of the ramp. Quintana stated that there were no "Wrong Way" signs on the Damen Avenue exit ramp on the date that he accidentally drove his truck up the exit

6

ramp.

Finally, defendant testified on his own behalf and stated that on the night of the collision, he consumed three alcoholic beverages at the bar near the intersection of 40th Street and Western Avenue and he consumed three additional alcoholic beverages at the bar on 18th Street. Defendant stated that by the time he realized he was driving his car in the wrong direction on the Damen Avenue exit ramp, he was already halfway up the ramp and he believed it would be impossible to turn around. Defendant stated that he decided to continue driving up the exit ramp and he decided that once he reached Interstate 55, he would cross the four lanes and make a "U-turn" so that he would be facing north. Defendant testified that he drove his car across the four lanes of traffic and testified that while he was stopped on the far left northbound lane facing south, he felt something hit his car, at which point he lost consciousness and awoke in the ambulance. Defendant confirmed that he saw "Wrong Way" signs on the Damen Avenue exit ramp, but he stated that he was already halfway up the ramp when he saw them.

Following the trial, the jury found defendant guilty of reckless homicide. At the sentencing hearing, the State presented evidence confirming that defendant had two prior cases involving driving under the influence of alcohol and that defendant was driving with a suspended license at the time of the collision. Following the sentencing hearing, defendant was sentenced to the maximum penalty for reckless homicide, which was 14 years' imprisonment. Defendant's motion to reconsider sentence was denied and he filed a timely notice of appeal.

DISCUSSION

Defendant's first argument on appeal is that he received a sentence for reckless homicide that was nine years longer than the maximum sentence permitted under the law at the time of his sentencing. Specifically, defendant argues that the circuit court violated his due process rights by failing to advise him of the option of receiving a sentence under the more favorable reckless homicide statute that was in effect on the date he was sentenced. The State responds by arguing

7

that the amendments to the reckless homicide statute were substantive and, therefore, defendant was not entitled to choose under which reckless homicide statute he should be sentenced. We agree with the State.

A defendant is entitled to be sentenced under either the law in effect at the time of the offense or the law in effect at the time of the sentencing. People v. Hollins, 51 Ill. 2d 68, 71 (1972). A defendant's due process rights are violated if (1) he is not advised of his right to elect the statute under which he should be sentenced and (2) he does not expressly waive that right. Hollins, 51 Ill. 2d at 71. If, however, the newly enacted statute changes the nature or substantive elements of an existing offense, the defendant may be convicted and sentenced under the law in effect at the time the offense was perpetrated. People v. Land, 178 Ill. App. 3d 251, 260 (1988); People v. Fisher, 135 Ill. App. 3d 502, 508 (1985).

In this case, on July 21, 2002, which was the date of the offense, section 9-3 of the Criminal Code classified reckless homicide as a Class 3 felony, punishable by two to five years' imprisonment. 720 ILCS 5/9-3(d)(2) (West 2000). In addition to the general classification of reckless homicide as a Class 3 felony, section 9-3(e) of the Criminal Code stated that "in cases involving reckless homicide in which the defendant was determined to have been under the influence of alcohol or any other drug or drugs as an element of the offense, or in cases in which the defendant is proven beyond a reasonable doubt to have been under the influence of alcohol or any other drug or drugs, the penalty shall be a Class 2 felony, for which a person, if sentenced to a term of imprisonment, shall be sentenced to a term of not less than 3 years and not more than 14 years." 720 ILCS 5/9-3(e) (West 2000). Based on the evidence at trial, which included evidence confirming that defendant's blood-alcohol concentration was more than three times the legal limit at the time his car collided with Melendez's motorcycle, the circuit court sentenced defendant to 14 years' imprisonment as a Class 2 felon pursuant to this version of section 9-3. 720 ILCS 5/9-3(e) (West 2000).

On July18, 2003, which was approximately one year after the date of the offense and approximately one year before the date of sentencing, the Illinois General Assembly amended section 9-3 of the Criminal Code. The Illinois General Assembly's amendment was made pursuant to People v. Pomykala, 203 Ill. 2d 198 (2003), a case in which our supreme court held that section 9-3(b) of the Criminal Code created an improper mandatory presumption because once the jury concluded that the defendant was intoxicated, the jury was to presume that the defendant was reckless unless the defendant proved that he was not reckless. Pub. Act 93--213, eff. July 18, 2003. This burden shifting, our supreme court held, was an unconstitutional violation of a defendant's due process rights.[1] Pomykala, 203 Ill. 2d at 209.

In the new version of section 9-3 of the Criminal Code enacted by the Illinois General Assembly in the wake of People v. Pomykala, reckless homicide generally remained a Class 3 felony punishable by two to five years' imprisonment. 720 ILCS 5/9-3(d)(2) (West 2004). Other aspects of section 9-3 of the Criminal Code, however, underwent significant changes. Most significant to defendant's appeal, Public Act 93--213 removed section 9-3(e), which previously had raised reckless homicide involving driving under the influence of alcohol or drugs from a Class 3 felony to a Class 2 felony, punishable by 3 to14 years' imprisonment.

In addition, at the time Public Act 93--213 was enacted, the Illinois General Assembly amended section 11-501 of the Illinois Vehicle Code (625 ILCS 5/11-501 (West 2004)). Specifically, the Illinois General Assembly offset the removal of section 9-3(e) from the reckless homicide statute by adding similar language to section 11-501(d) of the Illinois Vehicle Code,

---

[1]Section 9-3(b) of the Criminal Code, which our supreme court held created an unconstitutional mandatory presumption of recklessness, provided:

"In cases involving reckless homicide, being under the influence of alcohol or any other drugs at the time of the alleged violation shall be presumed to be evidence of a reckless act unless disproved by evidence to the contrary." 720 ILCS 5/9-3(b) (West 2000).

which is the section of the Illinois Vehicle Code that defines aggravated driving under the influence (aggravated DUI). 625 ILCS 5/11-501(d) (West 2004).

Defendant and the State agree that during the time between the date of the offense and the date of sentencing, amendments to the reckless homicide statute, inter alia, reduced the sentencing range for certain conduct. In addition, defendant and the State agree that if the changes to the reckless homicide statute merely reduced the applicable punishment, then defendant was entitled to be sentenced under the amended reckless homicide statute, which contained a sentencing range of two to five years rather than a sentencing range of 3-14 years. See Hollins, 51 Ill. 2d at 71. However, defendant and the State disagree regarding whether, in addition to the change in the sentencing range, the amendments to the reckless homicide statute constituted a substantive change such that defendant was not entitled to choose under which reckless homicide statute he should be sentenced. In sum, the first issue on appeal is whether Public Act 93-213's amendments resulted in substantive changes to the reckless homicide statute. We believe they did.

In support of its argument that the changes to the reckless homicide statute that were made by Public Act 93-213 were substantive and, therefore, defendant was not permitted to take advantage of the revised reckless homicide statute, the State relies on our decision in People v. Land. 178 Ill. App. 3d 251 (1998). In People v. Land, a 16-year-old defendant had been sentenced as an adult for attempted rape under a statutory provision that gave the circuit court discretion whether to sentence the defendant as an adult or as a juvenile where he was convicted of an offense other than several enumerated offenses, including rape. Land, 178 Ill. App. 3d at 259-60. Between the time of the defendant's arrest and the defendant's sentencing, the Illinois General Assembly amended the statutory provisions at issue. The amendatory changes replaced the term "rape" with the term "aggravated criminal sexual assault." Land, 178 Ill. App. 3d at 260. In addition, the amendatory changes eliminated judicial discretion and, instead of judicial discretion, the new statute provided that a minor must be sentenced as a juvenile if he or she was tried as an adult but

convicted of offenses other than those listed in the statute. Land, 178 Ill. App. 3d at 260.

The defendant in People v. Land argued on appeal that the amendatory changes should apply to his case and that the circuit court had erred in sentencing him as an adult. Land, 178 Ill. App. 3d at 260. This court first noted that although a defendant could take advantage of the mitigation of punishment in a new law where the new law became effective prior to a defendant's sentencing, a defendant could not do so where the new law changed the nature or substantive elements of the offense rather than only the punishment. Land, 178 Ill. App. 3d at 261. Noting some of the amendatory changes that had been made by Public Act 83-1067, this court compared the elements of the former offense of rape and the new offenses of criminal sexual assault and aggravated criminal sexual assault and concluded that Public Act 83-1067 changed the nature and substantive elements of the offense rather than only the punishment for the former offense of rape. Land, 178 Ill. App. 3d at 260-61. The defendant in People v. Land, therefore, was not entitled to be sentenced under the more favorable provisions of the new law. Land, 178 Ill. App. 3d at 261.

Applying our decision in People v. Land to the facts of this case, we believe that Public Act 93-213, (Pub. Act 93--213, eff. July 18, 2003), which repealed parts of section 9-3 of the Criminal Code (720 ILCS 5/9-3(d)(2) (West 2000)), affected the nature and substance of the reckless homicide statute rather than only changing the sentencing. Most importantly, Public Act 93-213 eliminated the enhancing elements in the reckless homicide statute with regard to reckless homicide while intoxicated. In addition, Public Act 93--213 amended section 9-3 of the Criminal Code by adding several subsections, all of which permitted defendants convicted of reckless homicide to be punished as a Class 2 felon under circumstances not permitted prior to the amendments. See 720 ILCS 5/9-3(e-7), (e-8), (e-9) (West 2004). Finally, we note that the Illinois General Assembly created a new category of offense under the DUI statute in order to replace the provisions that Public Act 93-213 eliminated from the reckless homicide statute. See 625 ILCS

5/11-501(d) (West 2004). The new offense under the DUI statute provided for the exact same penalties as the former offense of reckless homicide. Thus, it is clear that in enacting Public Act 93-213, the Illinois General Assembly never intended for the punishment to be any less stringent for those who, like defendant, drive under the influence of alcohol or drugs and cause death. In light of these substantive changes, we do not believe that defendant should have been entitled to take advantage of the more favorable sentencing provisions created by Public Act 93-213.

Before we address the other issues raised by defendant's appeal, we note that in People v. Malin 359 Ill. App. 3d 257 (2005) and in People v. Gancarz, No. 2-04-0190 (June 30, 2006), the Second District Appellate Court was faced with appeals that, like defendant's appeal in this case, asserted the circuit court erred when it failed to give the defendants the opportunity to be sentenced under the version of the reckless homicide statute created by Public Act 93-213. In People v. Malin, the Second District denied defendant's request for a new sentencing hearing because the defendant had been sentenced as a Class 2 felon pursuant to a plea bargain rather than after a trial. Malin, 359 Ill. App. 3d at 262. In dicta, however, the Second District cited to our supreme court's decision in People v. Hollins, 51 Ill. 2d at 71, and suggested that if defendant had been convicted after a trial, he would have been entitled to be sentenced as a Class 3 felon under the revised reckless homicide statute. Malin, 359 Ill. App. 3d at 262.

More recently in People v. Gancarz, the Second District concluded that the defendant should have been given the opportunity to be sentenced under the reckless homicide statute created by Public Act 93-213 and remanded the defendant's case to the circuit court for a new sentencing hearing. Gancarz, 2006 Ill. App. LEXIS at 64. In People v. Gancarz, the State argued that even though Public Act 93-213 eliminated the enhanced sentence for driving under the influence, the State could amend the defendant's indictment, even after the conclusion of trial, to allege a violation of the new aggravated DUI statute. The Second District disagreed and reasoned that the

12

State could not amend the indictment against the defendant after trial to allege a violation of the new aggravated DUI statute since that statute was not in effect on the date that the defendant committed the crime for which he was convicted. Gancarz, 2006 Ill. App. LEXIS at 53. The Second District held that allowing the State to amend the indictment to allege a violation of the new aggravated DUI statute would have invalidated the charging instrument. Gancarz, 2006 Ill. App. LEXIS at 66.

After reviewing the Second District's decisions in both People v. Malin and in People v. Gancarz, we believe that our case is distinguishable since we reach our conclusion based on the fact that Public Act 93-213 made substantive changes to the reckless homicide statute such that defendant was not entitled to choose under which statute he wished to be sentenced. We note, however, that to the extent our decision in this case conflicts with either People v. Malin or People v. Gancarz, we respectfully decline to follow the Second District's decisions in those cases.

Defendant's next argument on appeal is that his conviction for reckless homicide should be reversed because the jury instructions and verdict form inadvertently referred to the crime as "aggravated reckless homicide" rather than simply "reckless homicide." Specifically, defendant asserts that since "aggravated reckless homicide" is not a crime listed in the Criminal Code, his conviction for reckless homicide was improper. We disagree.

Defendant concedes that there were no objections at trial when the State inadvertently referred to the crime with which defendant was charged as "aggravated reckless homicide" rather than simply "reckless homicide," which was the actual crime with which defendant was charged. Therefore, we address defendant's argument on this issue by applying the plain error standard set forth in Illinois Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). In a criminal case, the plain error doctrine may be invoked in two instances: first, where the evidence in the case is closely balanced and, second, where to leave the error uncorrected raises a substantial risk that an accused

13

was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. People v. Shaw, 186 Ill. 2d 301, 326-27 (1998). The error must be so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error. Shaw, 186 Ill. 2d at 327.

In this case, we cannot say that the evidence was closely balanced. Evidence at trial confirmed that defendant's blood-alcohol level was 0.247 grams per deciliter of ethanol, which was more than three times the legal limit. Moreover, Cahue confirmed that defendant had consumed more than 10 beers before driving his car from the bar on 18th Street and defendant confirmed that he drove the wrong way onto the Damen Avenue exit ramp. Finally, evidence confirmed that defendant was driving southbound in the northbound lanes on Interstate 55 at the time that his car collided with Melendez's motorcycle. This record confirms that the evidence against defendant was overwhelming rather than closely balanced.

In addition, we cannot say that the fact that the jury instructions and verdict form called the crime "aggravated reckless homicide" amounted to plain error. At defendant's trial, all of the evidence presented and all of the arguments that were made to the jury pertained to the crime with which defendant was charged: reckless homicide. Most importantly, although the word "aggravated" was inadvertently mentioned by the State during its closing arguments and it was mistakenly included in the jury instructions and on the verdict form, the crime for which defendant was indicted was reckless homicide and each element of reckless homicide was proven to the jury beyond a reasonable doubt. Faced with this record, we cannot agree with defendant's assertion that the inadvertent references to the crime with which defendant was charged as "aggravated reckless homicide" amounted to a "fundamental violation of due process"; on the contrary, we believe that the circuit court could have corrected the error by sustaining an objection or properly instructing the jury that the crime with which defendant was charged was "reckless homicide" rather than "aggravated reckless homicide."

14

Defendant's next argument on appeal is that he was denied a fair trial because the State engaged in various acts of misconduct. First, defendant asserts that he was denied a fair trial because, in violation of Supreme Court Rule 412 (134 Ill. 2d R. 412), the State failed to produce the photographs and measurements of the accident scene upon which Trooper Dimopoulos based his conclusions regarding the circumstances surrounding the collision between defendant's car and Melendez's motorcycle. Second, defendant contends that when the State failed to tender Trooper Dimopoulos's photographs and measurements, defense counsel should have moved for sanctions pursuant to Supreme Court Rule 415 (134 Ill. 2d R. 415) and defense counsel's failure to do so amounted to ineffective assistance of counsel. Finally, defendant asserts that he was denied a fair trial because, while cross-examining defendant's traffic crash reconstruction expert, the State called into question the information upon which the expert had based his opinion and, therefore, the State benefitted from not providing defendant with Trooper Dimopoulos's photographs and measurements. We disagree.

At trial, defendant failed to object to any of the State's alleged misconduct and, therefore, we address defendant's allegations of misconduct by applying Illinois Supreme Court Rule 615(a)'s plain error standard. 134 Ill. 2d R. 615(a). As stated, in criminal cases, the plain error doctrine may be invoked if either (1) the evidence in the case is closely balanced or (2) the uncorrected error raises a substantial risk of undermining the integrity of the judicial process. Shaw, 186 Ill. 2d at 326-27. When assessing whether there is a substantial risk that the integrity of the judicial process would be undermined if the error was left uncorrected, we consider whether the trial court could have cured the error by sustaining an objection or instructing the jury to disregard the error. Shaw, 186 Ill. 2d at 327.

As discussed supra, the evidence in this case was not closely balanced; indeed, the evidence overwhelmingly confirmed that defendant was extremely intoxicated at the time he drove his car in the wrong direction on Interstate 55 and collided with Melendez's motorcycle, which resulted in

15

Melendez's death. Therefore, defendant's conviction will not be overturned unless the alleged misconduct was of such a magnitude that the defendant was denied a fair trial. We address each of the alleged errors in turn.

First, defendant argues that he was denied a fair trial because, in violation of Supreme Court Rule 412 (134 Ill. 2d R. 412), the State failed to produce the photographs and measurements of the accident scene upon which Trooper Dimopoulos based his conclusions regarding the circumstances surrounding the collision between defendant's car and Melendez's motorcycle. Supreme Court Rule 412(a)(iv) requires disclosure of "any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert." 134 Ill. 2d R. 412(a)(iv). Supreme Court Rule 412(c) also requires the State to "disclose information within its possession and control." 134 Ill. 2d R. 412(c). In this case, Trooper Dimopoulos prepared his report and attached to the report the measurements and photographs upon which his conclusions were based. Trooper Dimopoulos then submitted the report, the photographs, and the measurements to a State Police "approval committee." When the State was preparing for trial, the State spoke with trooper Dimopoulos and requested that he submit a copy of his report and the accompanying measurements and photographs. In response to the State's request, Trooper Dimopoulos looked in the file in which his report was stored and found the report. The measurements and photographs, however, were no longer attached to the report.

While it is certainly troubling that Trooper Dimopoulos's photographs and measurements were lost before trial, this record confirms that the loss of Trooper Dimopoulos's measurements and photographs did not result in prejudice to defendant. First, defendant received a copy of Trooper Dimopoulos' report and the report referred to the measurements that he obtained from the scene of the collision. Second, while the specific photographs that Trooper Dimopoulos had attached to his report were lost, the State provided defendant with other relevant photographs,

16

including photographs depicting the condition of defendant's car and Melendez's motorcycle after the collision. In fact, defendant's expert, Dr. Cohn, reviewed and relied on both Trooper Dimopoulos' report and the photographs of defendant's car and Melendez's motorcycle when he developed his expert opinion, which conflicted with the conclusions reached by Trooper Dimopoulos. Third, Trooper Dimopoulos was questioned at length, both by the State on direct examination and by defendant on cross-examination, regarding the basis for the conclusions he reached in his report, regarding the lost measurements and photographs, and regarding how this evidence could have been misplaced after he submitted his report. The jury, therefore, was fully aware why this evidence was available neither to defendant nor to Dr. Cohn. Finally, this record provides no indication that the lost photographs and measurements were in any way favorable to defendant and there is nothing to suggest that the lost measurements and photographs prejudiced defendant. Therefore, we must conclude that defendant was not denied a fair trial because the State failed to provide defendant with the photographs and measurements originally attached to Trooper Dimopoulos's report.

Furthermore, defendant's ineffective assistance of counsel claim must also fail. Defendant asserts that trial counsel was ineffective because he failed to move for sanctions after the State failed to provide defendant with the photographs and measurement that were originally attached to Trooper Dimopoulos's report. Defendant asserts that trial counsel should have moved for sanctions against the State pursuant to Supreme Court Rule 415 (134 Ill. 2d R. 415), which provides courts with the power to impose sanctions upon parties that fail to comply with the rules of discovery.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that: (1) trial counsel's representation fell below an objective standard of reasonableness, and (2) a reasonable probability exists that, but for counsel's errors, the result of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 668, 693, 104 S. Ct. 2052, 2064 (1984); People v. Albanese, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1254 (1984). As stated

17

supra, there is no indication that defendant experienced any prejudice as a result of the lost photographs and measurements. Therefore, because there is no reasonable probability that the outcome of the trial would have been different, we cannot agree that trial counsel was ineffective when he failed to move for sanctions pursuant to Supreme Court Rule 415. See People v. Grant, 339 Ill. App. 3d 792, 799 (2003) (holding that "[w]here the defendant fails to prove prejudice, the reviewing court need not determine whether [trial] counsel's performance constituted less-than-reasonable assistance").

Next, defendant argues that he was denied a fair trial because, according to defendant, the State exploited its own failure to turn over Trooper Dimopoulos's photographs and measurements. Specifically, defendant asserts that when it cross examined defendant's expert in traffic crash reconstruction, the State called into question the information upon which the expert's opinion was based. Contrary to defendant's assertion, however, this record confirms that defendant's right to a fair trial was in no way undermined by the State's cross examination of defendant's expert witness.

First, this record confirms that the jury knew that the State, rather than defendant or defendant's traffic crash reconstruction expert, Dr. Cohn, was culpable for losing Trooper Dimopoulos's photographs and measurements. For example, both the State and defendant made it clear to the jury that Trooper Dimopoulos' photographs and measurements were lost before trial and that Dr. Cohn, therefore, was unable to review that material when he prepared his opinion regarding the circumstances surrounding the collision.

Second, this record also confirms that Dr. Cohn testified that the absence of Trooper Dimopoulos's photographs and measurements did not undermine his ability to reach a conclusion regarding the circumstances surrounding the collision between defendant's car and Melendez's motorcycle. For example, during cross-examination, the State asked Dr. Cohn whether the fact that he was unable to review Trooper Dimopoulos's photographs and measurements "intefere[d] in any way with [his] ability to come up with a conclusion or opinion in this case." Dr. Cohn did not

18

state that the lost photographs and measurements undermined his ability to reach a conclusion as to the circumstances surrounding the collision; on the contrary, Dr. Cohn stated that he was able to reach a "conclusion based upon what [he] had." Faced with this record, we cannot agree with defendant's contention that the State's alleged misconduct undermined the fairness of defendant's trial.

Defendant's next argument on appeal is that he was denied a fair trial because the circuit court overruled his objections and permitted the State to offer into evidence various photographs. Specifically, defendant asserts that the circuit court erred in allowing into evidence (1) photographs of "Wrong Way" signs that were purportedly on the Damen Avenue exit ramp onto which defendant drove his car in the wrong direction and (2) photographs that depicted Melendez's injuries. We disagree.

In general, photographs are admissible into evidence if they are identified by a witness who has personal knowledge of the subject matter depicted by the photographs and the witness testifies that the photographs are a fair and accurate representation of the subject matter at the relevant time. People v. Fountain, 179 Ill. App. 3d 986, 994 (1989). The trial court's admission of photographs will not be reversed absent a showing of an abuse of discretion. People v. Smith, 20 Ill. App. 3d 756, 760 (1974).

First, defendant asserts that the State failed to establish that the photographs of the "Wrong Way" signs depicted the "Wrong Way" signs on the Damen Avenue exit ramp on July 21, 2002, which was the date of the collision. Defendant also argues that the photographs of the "Wrong Way" signs were irrelevant and highly prejudicial. Contrary to defendant's assertions, however, this record confirms that defendant testified that he saw a "Wrong Way" sign halfway up the Damen Avenue exit ramp. In addition, Trooper Walker, who patrolled the area surrounding the Damen Avenue exit ramp during the 18 months preceding the date of the collision, confirmed that there were "Wrong Way" signs posted on all of the exit ramps off of Interstate 55. Hence, both

defendant's testimony and Trooper Walker's testimony served to establish a proper foundation. In addition, it is clear that the "Wrong Way" photographs were relevant to the issue of whether defendant's decision to drive his car in the wrong direction onto the Damen Avenue exit ramp constituted reckless conduct and we simply cannot agree that the photographs were prejudicial. Faced with this record, we cannot say that the circuit court abused its discretion when it permitted the State to offer photographs of the "Wrong Way" signs.

Second, defendant asserts that he was denied a fair trial because the circuit court permitted the State to offer into evidence five photographs depicting defendant's injuries. This court has confirmed that if photographic evidence is relevant to prove facts at issue and if the probative value outweighs the potential prejudice, the photographs are admissible, even if such photographs are disgusting or gruesome. People v. Mercado, 333 Ill. App. 3d 994, 1001 (2002).

In this case, when the circuit court overruled defendant's objection and admitted into evidence five photographs depicting Melendez's injuries, the circuit court stated:

"The State has chosen five distinct photographs of different parts of the body of the victim. [The State] has the burden of proving cause and manner of death. So I find that the probative value outweighs the prejudicial value, and they will be admitted."

While it is possible that the use of five photographs may have been more than necessary to establish the cause of Melendez's death, we cannot agree with defendant's contention that the circuit court's decision to overrule defendant's objection and to allow all five photographs into evidence amounted to an abuse of discretion or in any way undermined the fairness of defendant's trial.

Defendant's final argument on appeal is that defendant's 14-year sentence was excessive in that (1) the circuit court failed to consider the mitigating circumstances and (2) the circuit court erred when, during the hearing on the motion to reconsider defendant's sentence, the circuit court inaccurately stated that defendant had a "pending" driving under the influence case. We disagree.

Absent a showing by a defendant to the contrary, the circuit court is presumed to have considered the mitigating factors presented by a defendant. People v. Labosette, 236 Ill. App. 3d 846, 862 (1992). Here, during the sentencing hearing, the circuit court expressly stated that all of the evidence was considered. Defendant, therefore, has failed to overcome the presumption that the circuit court considered the mitigating factors presented by defendant.

The circuit court's determination regarding the appropriateness of a sentence will not be overturned absent an abuse of discretion. People v. Wilson, 143 Ill. 2d 236, 250 (1991). In addition, reviewing courts are especially hesitant to find that the circuit court's determination regarding the appropriateness of a sentence constituted an abuse of discretion when the sentence imposed falls within the statutory limitation. People v. Wright, 246 Ill. App. 3d 761, 775 (1992).

Here, the State offered evidence suggesting that defendant had two prior cases involving driving under the influence of alcohol and offered evidence confirming that defendant was driving with a suspended license at the time of the collision. Based on this evidence, the circuit court sentenced defendant to the maximum sentence, which was 14 years' imprisonment. Defendant filed a motion to reconsider sentence and during the hearing on the motion to reconsider sentence, the circuit court mistakenly stated that defendant had a "driving under the influence case pending." The circuit court denied the motion to reconsider and upheld the original sentence of 14 years' imprisonment.

Defendant suggests that the circuit court's misstatement during the hearing on the motion to reconsider warrants a new sentencing hearing. This record confirms, however, that the misstatement was made during the hearing on the motion to reconsider and there is no reason to believe that the misstatement affected defendant's sentence. This is especially true in light of the fact that, following the hearing on the motion to reconsider sentence, the circuit court simply affirmed the 14-year sentence it had imposed at the sentencing hearing. In addition, this record confirms that the circuit court's misstatement regarding the "pending" driving under the influence

of alcohol case was an isolated misstatement and did not change the fact that, as the circuit court determined during the sentencing hearing and reiterated during the hearing on the motion to reconsider sentence, defendant had a history of driving under the influence of alcohol. Faced with this record, we cannot agree with defendant's contention that the circuit court's isolated misstatement during the hearing on the motion to reconsider sentence had an adverse affect on defendant's sentence. Thus, we find that defendant's 14-year sentence was neither excessive nor an abuse of discretion.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'MARA FROSSARD, and GALLAGHER, JJ., concur.